**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**COLUMBIA DIVISION**

| | | |
|---|---|---|
| DECISIONING.COM, INC., | ) | |
| a Delaware Corporation, | ) | Civil Action No.: 3: 03-1924-CMC |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| - v- | ) | |
| | ) | ORDER GRANTING MOTION FOR |
| FEDERATED DEPARTMENT STORES, | ) | SUMMARY JUDGMENT |
| INC., a Delaware Corporation, and its | ) | |
| subsidiary FDS BANK; MACYS.COM, | ) | |
| INC., a New York Corporation; | ) | |
| BLOOMINGDALE'S, INC., an Ohio | ) | |
| Corporation; THE BON, INC., an Ohio | ) | |
| Corporation, d/b/a the Bon Marché; | ) | |
| BURDINE'S, INC., an Ohio Corporation; | ) | |
| RICH'S DEPARTMENT STORES, INC., | ) | |
| an Ohio Corporation d/b/a Rich's-macy's, | ) | |
| Lazarus, and Goldsmith's; FACS | ) | |
| GROUP, INC.; FEDERATED SYSTEMS | ) | |
| GROUP, INC.; and DEPARTMENT | ) | |
| STORES NATIONAL BANK, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

This matter is before the court on motion of all Defendants (Federated Department Stores, Inc. and various affiliated entities (collectively "Federated")) for summary judgment of non-infringement under Fed. R. Civ. P. 56. The motion is granted for the reasons set forth below.

## INTRODUCTION

Plaintiff decisioning.com ("DCI"), brought this action alleging infringement of U.S. Patent No. 6,105,007 ("the '007 Patent") by the various Federated Defendants. Proceedings were stayed for a substantial period of time pending reexamination of the '007 Patent by the United States Patent Office.

After reexamination proceedings were concluded, the court scheduled a claim construction hearing in this and two related matters.[1] The court issued its claim construction rulings orally over the course of the two day hearing, setting out its reasons for each aspect of its construction on the record. *See* Transcripts at Dkt Nos. 112 & 113. The oral ruling was followed by a written order setting forth the construction given to each disputed term, but not repeating the reasoning. Dkt No. 111 (Order entered December 6, 2006).

Thereafter, the court received and accepted briefing on a motion to modify the claim construction rulings. Dkt No. 89. This motion was denied. Dkt No. 121 (docket text order). The claim construction, therefore, remains as set forth in the Order entered December 6, 2006.

The motion now before the court turns on the interpretation given to two of the numerous claim terms which were in dispute: (1) "remote interface"; and (2) "verify the applicant's identity." Federated maintains that there is no evidence which would support a finding that its system satisfies either claim limitation in light of this court's construction of those terms.

DCI concedes that Federated's system does not literally infringe the "remote interface" limitation in light of this court's construction of the term.[2] DCI asserts, nonetheless, that it has sufficient evidence to present a jury question as to whether this limitation is satisfied under the doctrine of equivalents. As to the identity verification limitation, DCI argues that there is evidence from which a jury could find literal infringement.

---

[1] The related matters are: *Decisioning.com, Inc. v. Ameritrade Holding, et al*, Civil Action No. 3:03-cv-02837-CMC; and *Household Int'l, Inc. v. Decisioning.com, Inc.*, Civil Action No. 3:04-cv-01200-CMC.

[2] This is not, of course, a concession of the validity of that construction.

2

## LEGAL STANDARDS

### I.    Patent Infringement

Infringement of a patent may be either literal infringement or infringement under the doctrine of equivalents. *Jeneric/Pentron, Inc. v. Dillon Co.*, 205 F.3d 1377, 1380 (Fed. Cir. 2000). In either case, the proof of infringement must address each element of the claims. *Id.* ("An accused product infringes if it embodies each claim element or its equivalent.").

**Literal Infringement.** To establish literal infringement, the patent holder must demonstrate that each of the elements or "limitations" of each claim of the patent at issue is present in the accused system. *See, e.g., Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1330 (Fed. Cir. 2001); *Mas-Hamilton Group v. LaGard, Inc.*, 156 F.3d 1206, 1211 (Fed. Cir. 1998). Moreover, the accused system must contain each limitation of the asserted claim exactly, without deviation. *Litton Sys., Inc. v. Honeywell, Inc.*, 140 F.3d 1449, 1454 (Fed. Cir. 1998) ("Literal infringement requires that the accused device contain each limitation of the claim exactly; any deviation from the claim precludes a finding of literal infringement."). Therefore, "[i]f even one limitation is missing or not met as claimed, there is no literal infringement." *Mas-Hamilton Group*, 156 F.3d at 1211 (internal citations omitted). *See also Telemac Cellular Corp.*, 247 F.3d at 1330; *Litton Sys., Inc.*, 140 F.3d at 1454.

**Doctrine of Equivalents.** In the absence of literal infringement, a patent holder may also seek to establish infringement under the doctrine of equivalents. Under this doctrine, infringement may be found when: (1) every limitation of the asserted claim, or its equivalent, is found in the accused device, and (2) the equivalent limitation differs from what is literally claimed only insubstantially. *See Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 39-40 (1997) (holding, in addressing the function-way-result "triple identity" test, that "the particular linguistic

3

framework used is less important than whether the test is probative of the essential inquiry" of whether each element is insubstantially different). As noted in *Warner-Jenkinson*, "[a] focus on individual elements and a special vigilance *against allowing the concept of equivalence to eliminate completely any such elements* should reduce considerably the imprecision of whatever language is used." *Id.* (emphasis added).

The essential inquiry to be made in determining whether there is infringement under the doctrine of equivalents is, therefore, whether "the accused product or process contains elements identical or equivalent to *each claimed element* of the patented invention." *Id.* at 40 (emphasis added). As further stated in *Warner-Jenkinson:*

> [T]he doctrine of equivalents must be applied to individual elements of the claim, not to the invention as a whole. It is important to ensure that the application of the doctrine, even as to an individual element, is not allowed such broad play as to effectively eliminate that element in its entirety.

*Warner-Jenkinson*, 520 U.S. at 29.

Therefore, in accordance with the "all elements rule," there can be no infringement under the doctrine of equivalents if any one limitation of a claim or its equivalent is not present in the accused device or method. *See, e.g., Kustom Signals, Inc. v. Applied Concepts, Inc*., 264 F.3d 1326, 1333 (Fed. Cir. 2001). Likewise, if a finding of infringement under the doctrine of equivalents "would entirely vitiate a particular claim element," the court must rule that there is no infringement under the doctrine of equivalents. *Bell Atl. Network Servs. v. Covad Communs. Group, Inc*., 262 F.3d 1258, 1279-1280 (Fed. Cir. 2001).

**Prosecution History Estoppel.** The doctrine of equivalents is, however, subject to a limitation referred to as either prosecution history estoppel or file wrapper estoppel. *See generally Warner-Jenkinson*, 520 U.S. at 30 (noting that the court had not "dispose[d] of prosecution history

4

estoppel as a legal limitation on the doctrine of equivalents"). Prosecution history estoppel applies when an amendment is made during prosecution "to avoid the prior art, or otherwise to address a specific concern–such as obviousness–that arguably would have rendered the claimed subject matter unpatentable." *Id.* at 30-31.

Therefore, "[w]here the reason for [a] change [is] not related to avoiding the prior art, the change may introduce a new element, [without] necessarily preclud[ing] infringement by equivalents of that element." *Id.* at 33. Nonetheless, the court should

> place the burden on the patent holder to establish the reason for an amendment required during patent prosecution. The court then . . . decide[s] whether that reason is sufficient to overcome prosecution history estoppel as a bar to application of the doctrine of equivalents to the element added by that amendment. Where no explanation is established, . . . the court should presume that the patent applicant had a substantial reason related to patentability for including the limiting element added by amendment. In those circumstances, prosecution history estoppel would bar the application of the doctrine of equivalents as to that element. The presumption . . . [is] subject to rebuttal if an appropriate reason for a required amendment is established[.] [T]his gives proper deference to the role of claims in defining an invention and providing public notice, and to the primacy of the [Patent and Trademark Office] in ensuring that the claims allowed cover only subject matter that is properly patentable in a proffered patent application.

*Id.* at 33.

## II.   Summary Judgment

Summary judgment will be granted when the moving party demonstrates that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue of fact is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A factual dispute is material only if it might affect the outcome of the suit under governing law. *Id.* at 248. There is no genuine issue of material fact when "the record

taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). To defeat a motion for summary judgment, the non-moving party cannot continue to rely on unsubstantiated allegations but instead must present evidence sufficient for a reasonable jury to find in favor of that party, and it must "go beyond the pleadings and . . . designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

A court may grant summary judgment in a patent infringement case, as in any other case. *Avia Group Int'l, Inc. v. L.A. Gear Cal., Inc.*, 853 F.2d 1557, 1561 (Fed. Cir. 1988). Summary judgment of non-infringement is properly granted "when no reasonable jury could find that every limitation recited in the properly construed claim [] is . . . found in the accused device either literally or under the doctrine of equivalents." *Gart v. Logitech*, 254 F.3d 1334, 1339 (Fed. Cir. 2001).

### FACTS

The facts critical to this motion are undisputed. These include that: (1) no computer equipment is supplied by Federated for consumers to use in applying for credit cards; and (2) Federated's method of checking the identity of its credit card applicants consists only of checking the customer's name, address, social security number and a third-party credit card number.

**The '007 Patent**. The '007 Patent discloses and claims a fully-automated, closed loop financial account processing system. The particular claim limitations or elements at issue in this motion are the use of a "remote interface" and a requirement that the system "verify the applicant's identity." The first of these limitations was construed, in relevant part, to "refer to *dedicated computer equipment, meaning equipment supplied by the entity providing the financial account or service*, such as but not limited to equipment housed in a kiosk . . . " Dkt No. 111 at 3 (emphasis added). The second was construed, in relevant part, to refer to "confirm[ing] or substantiat[ing] the

6

applicant's identity . . . using information such as name, address, and social security number *plus some additional information* less likely to have been improperly obtained (*e.g.*, mother's maiden name, years at current address, years at job, etc)."  *Id.* at 3-4 (emphasis in original).

**Federated's Account Processing System.**  Federated's accused system is known as its "NAPS" system (for New Account Processing System).  NAPS is an automated processing system that receives a credit card application, decides whether to approve, reject, or refer the application to a credit analyst, and creates the credit records needed to support the new application.  McCaskill Decl. ¶ 3.  The NAPS system, as used throughout the period relevant to the infringement claim including at the present time, allows consumers to apply for a Macy's or Bloomingdale's credit card on the companies' websites.  McCaskill Decl. ¶ 9.[3]

An applicants' access to the Federated websites is through consumer-owned personal computers and is never through dedicated computer equipment nor through equipment supplied by Federated.  McCaskill Decl. ¶ 17.  Even at its retail stores, Federated does not supply customers with computer equipment to access the Internet or to apply for credit cards.  Gatio Decl. ¶ 3.

Once a customer is logged on to one of the websites, the customer can follow links to an on-line application for a Macy's or Bloomingdale's credit card.  After a customer has navigated the Federated website to the application page, he or she provides the following personal information: first and last names, home address, date of birth, social security number, home phone number, mother's maiden name, a third party credit card number, and e-mail address.  The data is then passed to the NAPS system and processed for a decision.

---

[3]  Federated asserts that the system has been in use by Federated since at least 1990 (McCaskill Decl. ¶ 4), well prior to the critical filing date of the '007 Patent.  DCI responds that the system has changed over the period it has been in use.  This dispute relates to the patent invalidity counterclaim and is not, therefore, material to the present motion.

Of the information provided by the applicant, only the name, address, social security number *and third-party credit card number* are used to check the applicant's identity. McCaskill Decl. ¶ 12. The maiden name of the applicant's mother, is *not* used to verify identity at this point in the process. Rather, it is maintained by Federated for possible *future use* in verifying identity, in the event that the application is approved. For example, it might be used to verify the identity of a caller checking on the account at some later point in time. McCaskill Decl. ¶ 13.[4]

After an on-line application is processed by NAPS, a decision, either accepted or further processing required, is reported back to the applicant's personal computer. McCaskill Decl. ¶ 16. If an application is accepted, the acceptance is merely provisional. An additional fraud check is performed by a Federated analyst before the account is operational. McCaskill Decl. ¶ 16.6.

## DISCUSSION

### I.     Remote Interface

#### A.     Construction of Claim Term

Each asserted claim of the '007 Patent requires a "remote interface," or depends from a claim including this or the synonymous limitations: "applicant interface" and "remote applicant interface."[5] The court construed these terms, collectively, as follows:

> For purposes of the '007 [Patent], these terms refer to *dedicated computer equipment, meaning equipment supplied by the entity providing the financial account or service,*

---

[4] Although there is a separate claim term relating to "final approval" of the account, this term is not at issue in the present motion. The fraud check may, however, be of some relevance to the present motion to the extent it relates to when and how the applicant's identity is verified.

[5] Some of the claims in the '007 patent use the terms "applicant interface" or "remote applicant interface." The manner of use suggests that these terms and "remote interface" are interchangeable as used in the '007 patent. In any event, the parties agreed that they should be construed uniformly. References in this order to "remote interface," therefore, also encompass the terms "applicant interface" and "remote applicant interface."

such as but not limited to equipment housed in a kiosk, which allows the applicant . . . to provide information to and receive information from a data processing system and which facilitates completion of all steps of the claim involving interaction between the applicant . . . and the data processing system.

Dkt No. 111 at 3 (emphasis added).

### B.    Literal Infringement

DCI concedes that there is no literal infringement of this claim limitation because the Federated system does not use "dedicated computer equipment."

### C.    Doctrine of Equivalents

DCI argues, nonetheless, that the limitation is met under the doctrine of equivalents. This argument, in its various subparts, seeks to establish that essentially the same functions of the patented system can be performed on a consumer-owned personal computer as on dedicated computer equipment.

DCI's approach misapprehends the essential nature of the limitation which requires that the remote interface consist of "dedicated computer equipment, meaning  equipment supplied by the entity providing the financial account or service." As explained during the claim construction hearing, dedicated computer equipment "clearly means not the consumer's equipment or not a home computer." Transcript at 1-168. The intent of this  construction was "to exclude personal computer systems owned and controlled by the consumer, or by the applicant." Transcript at 1-191.

By definition, a consumer-owned piece of equipment, regardless of how similar it may otherwise be, cannot be the equivalent of "dedicated computer equipment . . . supplied by the entity providing the financial account or service." This is because items which are opposites cannot be "equivalents." *See Bicon, Inc. v. Straumann Co.,* 441 F.3d 945, 955 (Fed. Cir. 2006) (stating that "[a] claim that contains a detailed recitation of structure is properly accorded correspondingly limited

9

recourse to the doctrine of equivalents" and holding that a structure which is "concave" cannot be the equivalent of a structure which is described as "convex"). *See also Cooper Cameron Corp. v. Kvaerner Oilfield Prods.*, 291 F.3d 1317, 1322 (Fed. Cir. 2002) (holding that a limitation describing an entry point as being "above" two specified plugs could not be the equivalent of an entry point "between" the two plugs); *Moore U.S.A., Inc., v. Standard Register Co.*, 229 F.3d 1091, 1094 (Fed. Cir. 2000) (holding that claim which required adhesive strip cover a "majority" of a particular length of a form could not be met equivalently by a device which used a strip which extended only 47.8% of the length of the form because, as a matter of law, a "minority" could not be a "majority").

DCI cannot, in any event, succeed under the doctrine of equivalents because "dedicated computer equipment" is not the equivalent of a consumer-owned personal computer. Consumer-owned personal computers are normally used for a wide range of functions, including but hardly limited to: on-line shopping; word processing; photograph storage; Internet surfing; e-mailing; and game playing. To the extent these activities involve business transactions, the transactions would not be limited to any particular vendor. By contrast, "dedicated computer equipment" would be limited to providing specific functions (here related to the relevant financial transactions) and would generally be limited to services provided by a single entity (or a related group of entities).

### D.    Prosecution History Estoppel

Prosecution history estoppel also limits DCI's application of the doctrine of equivalents to Federated's system. The original patent application, from which the '007 patent descended, was filed on August 27, 1993. *See* Dkt No. 91-4 (U.S. Patent App. 08/113,205 at 2). It included a disclosure of an alternative to a kiosk for the interface and stated that "[i]n an alternative embodiment, borrowers can apply for a loan *using a personal computer 34 and a modem 36 . . . .*"

*Id.* at 24, ll. 20-22. As originally written, the first element of claim one of this application referred to a method which utilized "a programmed computer and a communication link." *Id.* at 29.

The path from this application to the issuance of the '007 patent involved a number of rejections and subsequent continuation-in-part and continuation applications (collectively "subsequent applications"). The reference to "using a personal computer . . . and a modem" was dropped from these subsequent applications. *See, e.g.,* Dkt No. 95 (continuation-in-part U.S. Patent App. 08/327,653 filed October 24, 1994). As originally written, the first claim of this application referred to a system which utilized a "kiosk" and a "computer controller carried by said kiosk and programmed to interact with said consumer." *Id.* at 27.[6]

A later continuation application in this series, filed on May 5, 1999, removed the reference to a kiosk from the initial claim,[7] referring instead to:

> An automatic account processing system . . . for applicants located at a remote interface, said system comprising:
>
> a.      a remote interface adapted to:
>
> > i.      allow an applicant to remotely request an account;
> >
> > ii.      receive data from an applicant[.]

Dkt No. 96-3 (U.S. Patent App. 09/305,622 at 3).

The term "remote interface" was not otherwise defined in the claims or elsewhere in the specifications. The specifications do, on the other hand, retain numerous references to kiosks and,

---

[6] Notably, this and later applications in the series leading to issuance of the '007 patent described a system which included significantly broader capabilities than in the earlier application. Many of the newly listed functions would require capabilities not found on most personal computers, particularly those available at the time of the initial continuation-in-part application.

[7] The application asked that the existing claims 1-20 be cancelled and replaced. The new "first" claim, therefore, is reflected as claim 21 on this page of the application.

as noted above, make no reference to a consumer-owned personal computer based alternative embodiment. Nothing else in this or any other document in the claim history following the October 24, 1994 application suggests an intent to encompass a consumer-owned personal computer within the meaning of "remote interface."

The prosecution history of the '007 Patent, therefore, reflects abandonment of consumer-owned personal computer as the means of interacting with the central system. DCI has offered no explanation of the change which would be sufficient to overcome prosecution history estoppel. *See Warner-Jenkinson*, 520 U.S. at 33 (quoted *supra*).[8] Consequently, the history reflects an intent not to include consumer-owned personal computers as an equivalent of "remote interface." *See Modine Mfg. Co. v. U.S. Int'l Trade Comm'n*, 75 F.3d 1545, 1558 (Fed. Cir. 1996). Therefore, prosecution history estoppel precludes DCI from relying on the doctrine of equivalents to encompass a system which utilizes a consumer-owned personal computer.

## II.     Verify the Applicant's Identity

### A.     Construction of Claim Term

Each claim of the '007 Patent which is at issue in this action requires that the system "verify the applicant's identity." The court construed this limitation as follows:

---

[8] While DCI acknowledges the existence of prosecution history estoppel as a limitation on the doctrine of equivalents, it never directly addresses its application to the "remote interface" element. Instead, DCI suggests that the court has already rejected any reliance on prosecution history estoppel. *See* Dkt No. 126 at 8 (DCI memorandum in opposition to summary judgment). This argument rests on a misconstruction of the order denying DCI's Motion for Reconsideration and Clarification of the Claim Construction which stated only that the court had not relied on prosecution history estoppel in *construing* the claim terms. *See* Dkt No. 123. As noted in that docket text order: " the distinct doctrine of prosecution history estoppel . . . would be applicable, if at all, only at a later stage in the proceedings." Clearly, that stage is now presented, given DCI's reliance on the doctrine of equivalents in response to the motion for summary judgment.

To "verify the applicant's identity" means to confirm or substantiate the applicant's identity. This is not limited to checking biometric information and does not exclude verification using information such as name, address, and social security number *plus some additional information* less likely to have been improperly obtained (e.g., mother's maiden name, years at current address, years at job, etc).

Dkt No. 111 at 3-4 (emphasis in original).

In so construing the '007 Patent, this court declined to accept various limitations proposed by Federated (and aligned parties in the related actions). For instance, the court declined to impose any requirement for a "biometric" form of verification such as a electronic signature match.

Nonetheless, the construction adopted by the court recognizes that identity "verification" requires a check of information which is *qualitatively* different from the specifically listed items of "name, address, and social security number." That qualitative difference must be such as to make the information "less likely to have been improperly obtained" than the three specifically listed items. Of the three listed items, the social security number would be the only one not generally available. Nonetheless, as DCI correctly notes, the court's use of "such as" preceding the list of examples indicates that the list itself is not exclusive.

## B. Literal Infringement

It is undisputed that Federated's system considers the first three specified items of information: name, address and social security number. Federated's system also considers one additional piece of information: a third-party credit card number. *See* McCaskill Decl. ¶ 12 (stating that the only information used by Federated to check identity, other than name, address and social security number, is a third-party credit card number, such as a Visa or MasterCard).

This satisfies the *quantitative* portion of the verification requirement that something beyond the three listed items be obtained and confirmed. The remaining question is whether the information obtained, a credit card number, might reasonably be found to satisfy the *qualitative* requirement that

it be of a type "less likely to have been improperly obtained" than the three listed items. For the reasons which follow, the court concludes that it could not.[9]

First, credit card information is not the type of information listed in the examples given in the court's construction. Each of the listed examples consists of items of personal information which the person identified would know without need to resort to other sources and, therefore, would not normally carry around in written form. Further, the information in the listed examples is of a type which would not normally be shared with others in the normal transaction of daily business. As a consequence, it is not the type of information likely to be readily available to someone who steals a wallet or searches through discarded bills. It is, presumably, for these reasons that this type of information is often used for "verification" of identity when photographic identification is not possible, such as in the course of internet or phone transactions.

For these reasons, the court concludes that a third-party credit card number does not fall within the general types of information provided by the examples and cannot, therefore, be considered adequate based on similarity to the listed examples. The court turns, therefore, to the broader question of whether a credit card number might, despite its dissimilarity to the examples given, be considered information of a type "less likely to have been improperly obtained" than the applicant's name, address and social security number.

---

[9] DCI argues that the format of this construction precludes a finding in Ameritrade's favor because the court did not state what is required, only what is not excluded. While the court agrees that the format does leave open numerous possibilities as to how identity might be verified, it disagrees that it precludes summary judgment where, as here, the verification method consists of checking the information expressly listed (name, address, and social security number) *plus some additional information*. Under those circumstances, the "additional information" must satisfy the expressly stated requirement that it be "less likely to have been improperly obtained" than the listed items. To do otherwise would read out the limitation placed on the "information checking" method of identity verification.

Credit cards, with all their attendant information (name, card number, expiration date and, sometimes, security code), are frequently provided to third-parties in the process of conducting legitimate transactions. Sometimes, these transactions are conducted in a manner which precludes the physical handling of the card by the third-party, or at least the removal of the card from the card holder's sight.[10] This is not, however, always the case. For example, transactions in restaurants frequently involve handling of the card by a waiter who completes the transaction beyond the sight of the card holder. Such instances, in particular, provide an opportunity to record all information on the card, including the full number, date of expiration, and any additional security code which may be found on the reverse of the card. Notably, this information might be recorded for either legitimate or illegitimate purposes or both. Thus, even through legitimate transactions, credit card information is readily available to third-parties.[11]

Credit cards are also generally carried with a person and, not infrequently, are either lost or stolen. Credit card numbers can also be obtained from credit card bills, when consumers fail to dispose of the bills in a manner which prevents misuse. This also provides an opportunity for someone to misappropriate the relevant information, although the expiration date and security code would generally not be included on the bill itself.[12]

---

[10] This is a relatively recent trend which was, at the least, less prevalent at the time the relevant patent application was filed and patent issued. Nonetheless, for present purposes the court will assume that current practices control.

[11] DCI relies heavily on the fact that federal law currently prohibits businesses which accept credit cards from printing the full card number or expiration date on any *receipts* which may be issued. *See* 15 U.S.C. § 1681c(g). While this law may reduce the risk of misuse based on examination of receipts, it has no bearing on misuse which might follow from examination of the *entire credit card* by sales persons, waiters, or others or their legitimate (or illegitimate) recording of the full credit card information for use by the business (other than on receipts).

[12] Here the court notes that the evidence is only that Federated obtains the number on the face of the card. Nonetheless, the court addresses the issue as if Federated also obtains the "more" secure information including the expiration date and any security code.

15

Based on these factors and focusing on the social security number in particular, Federated argues that no reasonable jury could find that a credit card number is "less likely to have been improperly obtained" than one's name, address, and social security number.

The court agrees. The court, therefore, concludes that DCI cannot establish that Federated's system "verif[ies] the identity" of the applicant as that phrase has been construed by this court because no reasonable jury could find that a credit card number is information "less likely to have been improperly obtained" than the combination of one's name, address, and social security number.

### C.    Doctrine of Equivalents

DCI does not rely on the doctrine of equivalents as to this claim limitation.

### CONCLUSION

For the reasons set forth above, the court concludes that all Defendants are entitled to summary judgment of non-infringement due to the absence of evidence sufficient to support a finding in DCI's favor on either of the two claim elements addressed above. This disposes of all claims against all Defendants. In light of this determination, the court dismisses, without prejudice, the counterclaims of these Defendants which seek to invalidate the underlying patent.

IT IS SO ORDERED.

s/ Cameron McGowan Currie
CAMERON MCGOWAN CURRIE
UNITED STATES DISTRICT JUDGE

Columbia, South Carolina
March 27, 2007

C:\temp\notesB0AA3C\03-1924 decisioning v federated sj order.wpd

16